**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., | § | |
| SUCCESSOR IN INTEREST TO | § | |
| U.S. TRUST COMPANY OF | § | |
| TEXAS, N.A. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2775 |
| | § | |
| LINDA STANLEY AS TRUSTEE, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This case arises out of disputes between Robert Alpert and Mark Riley that have played out

for more than a decade in IRS offices, Texas state courts, and this court.   Among other

disagreements, Alpert contests Riley's authority to act as trustee for four trusts established by Alpert

for his sons, Roman Merker and Daniel James Alpert.   Two of those trusts—the Roman Merker

Alpert Trust ("RAT") and the Daniel James Alpert Trust ("DAT")—are at issue in the present suit.

Linda Stanley, the trustee of both trusts, argues that the Bank of America acted improperly by

releasing approximately $1.3 million in trust funds to Riley after he obtained a judgment from the

Texas state probate court declaring him to be the trustee.   That judgment has since been reversed.

The Bank filed this suit in Texas state probate court seeking a declaratory judgment that it did not

act improperly in releasing the funds to Riley.   Stanley removed to this court and counterclaimed

for negligence, gross negligence, breach of contract, and breach of fiduciary duty.   The parties and

court agreed that dispositive motions on the Bank's liability to Stanley should be decided before

addressing damages.

Stanley has moved for summary judgment on her counterclaims.  (Docket Entry No. 19).
She argues that the Bank should not have released trust money to Riley because the probate court
judgment did not provide sufficient authority for doing so and because the Alpert family had notified
the Bank that it would appeal that judgment.  The Bank has responded and cross-moved for
summary judgment on its declaratory judgment claim and on Stanley's counterclaims.  (Docket
Entry No. 32).  The Bank argues that it was entitled to rely on the probate court judgment, that the
Texas Trust Code protects its good-faith reliance on the judgment despite the later reversal, and that
Stanley's tort claims should be dismissed because they seek contractual losses.  Stanley has
responded to the cross-motion, (Docket Entry No. 37), and the Bank has replied, (Docket Entry No.
38).

Based on the motions, responses, and replies; the evidence in the record; and the applicable
law, this court grants the Bank of America's motion for summary judgment and denies Stanley's
motion.  By **August 5, 2010**, the Bank must submit a proposed order of final judgment consistent
with this opinion.

The reasons for these rulings are explained below.

## I.      Background

Alpert created the RAT and the DAT in 1990 to benefit his sons.  The original trustee of both
trusts was Dr. Lisa Santos.  The trust documents authorized Santos to appoint her successor trustee.
If there was a vacancy and no successor was appointed, Alpert's sister, Sandra Shulak, would
become trustee.  *Alpert v. Riley*, 274 S.W.3d 277, 282 (Tex. App.–Houston [1st Dist.] 2008, pet.
denied).  In 1996, Riley, Alpert's attorney at the time, began acting as trustee of the trusts.  *Id.* at
282-83.  Much of the legal battle in the Texas probate court has focused on whether Riley was

2

appointed as trustee.  Alpert and Riley ceased their professional relationship in 1998.  Riley entered

into a confidential informant agreement with the IRS and accused Alpert of tax evasion.  Riley

believed that "Alpert had sold his own stocks to trigger a tax loss, and then caused the RAT and

DAT to buy those same stocks, which allegedly resulted in the overpayment of taxes by the trusts."

*Id.* at 283.  The IRS chose not to pursue the case but Riley filed suit in state probate court, alleging

that he was the trustee of the RAT and the DAT and seeking damages in the amount of the alleged

tax overpayment.  The trust beneficiaries intervened in the probate court suit, seeking a declaratory

judgment that Riley was not the trustee of either trust or an order removing him as trustee based on

his breach of fiduciary duty.  *Id.*

On January 14, 2000, the probate court appointed Karen Gerstner as temporary receiver for

the RAT and the DAT.  Gerstner was ordered to post a bond for each trust.  (Docket Entry No. 32,

Ex. 3).  Gerstner complied with this order.  On March 6, 2000, the probate court granted applications

Gerstner filed under section 194(5) of the Texas Probate Code to deposit trust assets in a safekeeping

arrangement with U.S. Trust Company.  (*Id.*, Ex. 4).  Section 194(5) allows a personal representative

such as a receiver to agree to deposit cash and other assets in a financial institution for safekeeping

subject to a court order preventing the assets from being withdrawn without the court's consent.

TEX. PROB. CODE § 194(5), (6).  "The amount of the bond of the personal representative shall be

reduced in proportion to the cash so deposited, or the value of the securities or other assets placed

in safekeeping."  TEX. PROB CODE. § 194(6).  The probate court's orders—one for each

trust—instructed Gerstner to deposit all cash and assets valued at $90,000 or more with U.S. Trust

for safekeeping.  (Docket Entry No. 32, Ex. 4).  The court ordered Gerstner to deliver its orders to

U.S. Trust and obtain an acknowledgment that "receipt by U.S. Trust Co. of a certified copy of an

Order of this Court shall be required for U.S. Trust Co. to be authorized to allow any withdrawal, disbursement, or delivery of assets belonging to [the trusts] on deposit pursuant to the safekeeping arrangement with U.S. Trust Co." (*Id.*).

U.S. Trust acknowledged receiving the orders and detailed the assets it held in safekeeping arrangements for each trust.  U.S. Trust charged a $5,000 fee per trust for the first year the safekeeping agreements were in effect.  It agreed that the assets in safekeeping "shall not be withdrawn, disbursed or delivered for any purpose except upon receipt of a certified copy of an Order of the above-named Court authorizing such withdrawal, disbursement or delivery." (*Id.*, Ex. 6).  The acknowledgment documents had a signature line for "court approval."  The probate judge signed both on August 25, 2000.  (*Id.*).  While the funds were in safekeeping, the probate court approved a series of withdrawals to meet trust expenditures by written orders.  (*See* Docket Entry No. 37, Ex. 1).

In the probate suit, the court ruled on cross-motions for summary judgment and held that Riley was properly appointed as trustee of the RAT and the DAT as of August 1, 1997.  The court also granted summary judgment for Riley on his claims against Alpert, holding as a matter of law that the stock transactions breached Alpert's fiduciary duty to the trust beneficiaries.  At trial, the jury found that Riley had breached his fiduciary duty to the trust beneficiaries but did not award any damages.  The jury also found that Alpert had breached his fiduciary duty to the trust beneficiaries by engaging in transactions that the probate judge had not resolved on summary judgment.  Again, the jury did not award damages. *Alpert*, 274 S.W.3d at 284.  On March 28, 2006, the probate judge entered judgment against Alpert in the amount of $1,234,445.50 for each of the two trusts, in addition to attorney's fees.  The judgment recited that Riley had been properly appointed as trustee

of the RAT and the DAT; terminated Riley's trusteeship as of the date of judgment; and reappointed Riley to serve as temporary trustee until the appeal ended, with "all the powers and duties of a Trustee under the Texas Trust Code and the Trust Indentures." (Docket Entry No. 32, Ex. 8 at 8).

The Bank has submitted the declaration of Ted Ellsworth, a former Vice President and Trust Officer for U.S. Trust. Ellsworth was the U.S. Trust officer responsible for the trust accounts for the RAT and the DAT. (*Id.*, Ex. 2). Ellsworth stated that, after the probate court issued the March 28, 2006 judgment, counsel for Riley presented a certified copy of the judgment to U.S. Trust. (*Id.*, ¶ 5). Neither Alpert nor any the trust beneficiaries had moved to supersede the judgment by posting a bond. On April 11, 2006, Ellsworth received a letter from Scott Rothenberg, counsel for Roman Alpert, the sole beneficiary of the RAT. Rothenberg stated in the letter that he anticipated a "huge battle" on appeal over whether Riley had authority over the safekeeping account. He asked that, while the appeal was pending, Ellsworth "not allow any withdrawals or other reductions in the trust corpus or trust earnings without my clients's express prior written consent." (*Id.*, Ex. 2, Ellsworth Decl., Ex. E). On April 12, 2006, Riley and a Vice President of Encore Bank sent Ellsworth a letter instructing him to "wire all cash proceeds from the U.S. trust checking and safe keeping accounts" to specified Encore Bank accounts. (*Id.*, Ex. 2, Ellsworth Decl., Ex. D). Ellsworth stated as follows in his declaration:

> I reviewed the certified copy of the Final Judgment and determined that it unequivocally appoints Mark Riley as a Trustee of the Trusts with all powers and duties of a Trustee. I conferred with a colleague regarding the Final Judgment provided to U.S. Trust by Mr. Riley's counsel and we concluded that it was a certified copy of a Final Judgment issued by the probate court in the Probate Proceedings. The Final Judgment expressly empowered Riley with all the powers and duties of a Trustee, which included the right and power to direct the transfer of funds from the Trust accounts. Accordingly, I

5

concluded that the certified copy of the Final Judgment satisfied any
and all requirements of the probate court's safekeeping orders.

(*Id.*, Ex. 2, ¶ 6).  Ellsworth stated that, based on the final judgment issued by the probate court, he

transferred the funds to Riley.  "I was aware that if I did not honor the instructions of a party that

had been named a Trustee in a valid Final Judgment, I could potentially expose U.S. Trust to legal

liability." (*Id.*, ¶ 7).  Ellsworth "noted that [the April 11] correspondence did not have the authority

of a court order, nor did it state that any court had or would prohibit U.S. Trust from following Mr.

Riley's instructions." (*Id.*).  Ellsworth "concluded that the express provisions of the probate court's

Final Judgment controlled over the attorney correspondence from Mr. Rothenberg." (*Id.*).  On April

12, 2006, Ellsworth wired $739,739.95 from the RAT safekeeping account and $609,499.76 from

the DAT safekeeping account to Riley's accounts at Encore Bank.

On April 26, 2006, Alpert and the trust beneficiaries for the first time attempted to supercede

the probate judgment.  They filed a motion in the probate court asking the court to "set the amount,

type and terms of security that Robert Alpert must post in order to suspend and/or supercede that

portion of the final judgment which reappoints Mark Riley as trustee over the RAT [and] the DAT."

(*Id.*, Ex. 11 at 6).  The probate judge held a hearing on May 5, 2006.  The judge stated that he would

set a bond to supercede the money judgment but would not stay the judgment establishing Riley's

trustee authority pending appeal.  The court reasoned that the purpose of the bond was to preserve

the status quo and leaving Riley in place as trustee was the status quo.  The court stated: "He's the

trustee and the final judgment approves his final count and terminated his services as trustee.  You

supercede that judgment, so it's no longer applicable.  If you don't supercede it, then he's trustee

again.  So he's the trustee." (*Id.*, Ex. 12 at 4, 10-11).  The court would not sign an order superceding

the portion of the judgment reappointing Riley but leaving the portion terminating Riley's trusteeship intact.  (*Id.* at 7, 11).

In June 2006, the Texas appellate court stayed enforcement of the final judgment pending appeal.  (*Id.*, Ex. 13).  On August 3, 2007, the probate court issued Findings of Fact and Conclusions of Law.  The court stated, as it had on the record at the earlier hearing, that under its judgment, Riley continued to have trustee authority while appeal was pending.  (*Id.*, Ex. 14).

The Texas appellate court largely reversed the probate court's judgment, affirming only in part.  The appellate court vacated the summary judgment in which the probate court held that Riley had been properly appointed as trustee of the RAT and the DAT and remanded on that issue.  The appellate court affirmed the order releasing Riley as trustee as of March 28, 2006 "as pertains to any trusteeship that may later be found to be valid."  *Alpert*, 274 S.W.3d at 298-99.  The court vacated the part of the judgment that reappointed Riley as successor trustee and rendered judgment that he was not the successor trustee and that any successor trustee must be "selected in accordance with the terms of the applicable trust instrument, after identification of the valid trustee for each trust." *Id.* at 299.  The appellate court held that the probate judge had not erred in declining to set a bond superceding the judgment as to Riley's trustee status.  The court explained:

> Riley has acted as trustee in fact since before the inception of the lawsuit.  The trial court's final judgment both terminates Riley as trustee and reappoints him as trustee pending the appeal until all rights to appeal are exhausted.  In requesting to post a bond, the appellants seek to change the status quo, not to preserve it.

*Id.* at 298.

Riley did not return the funds he had withdrawn from the U.S. Trust accounts before the appellate court's decision.  The probate case is still pending on remand in that court.  In this federal

court, a related suit is pending in which Alpert and the beneficiaries have sued Riley over his handling of Alpert's business matters unrelated to the DAT and RAT trusts and over the trust matters occurring after the date of the verdict in the probate court. *See Alpert v. Riley*, No. 4:04-cv-3774.   On August 14, 2009, the Bank of America, which had acquired U.S. Trust, filed the present suit in the probate court, seeking a declaratory judgment that U.S. Trust acted properly by transferring the trust funds to Riley.  Stanley, who became successor trustee on December 11, 2008, removed based on federal diversity jurisdiction.  Stanley asserted counterclaims for breach of the safekeeping agreements, breach of fiduciary duty, negligence, and gross negligence.  At a scheduling conference, the court and parties decided to determine whether the Bank had any liability before proceeding to damages. The parties engaged in limited discovery on the liability issues and have agreed that the present record is sufficient to allow this court to decide those issues as a matter of law.  The parties filed cross-motions for summary judgment on liability.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it

does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Id.* (emphasis in original); *see also Meecorp Capital Markets LLC v. Tex-Wave Industries LP*, 265

9

Fed. App'x 155, 157 (5th Cir. 2008) (per curiam) (unpublished) (quoting *Fontenot*, 790 F.2d at 1194).

### III.    Analysis

In response to Stanley's allegation that the Bank violated its agreement to hold assets in safekeeping by releasing the trust funds to Riley, the Bank has made three primary arguments.  The first is that the probate court's judgment satisfied the provision in the safekeeping agreements allowing funds to be released upon a court order.  The second is that the safekeeping agreements were made irrelevant by the probate court's final judgment.  Finally, the Bank argues that the Texas Trust Code protects its good-faith reliance on the probate court judgment, even if that judgment was later reversed and even if the Bank's determination that the judgment gave Riley authority to take the funds later proved to be incorrect.

As to the first argument, in the safekeeping agreements, the Bank acknowledged that the trust assets "shall not be withdrawn, disbursed or delivered for any purpose except upon receipt of a certified copy of an Order of the [probate court] authorizing such withdrawal, disbursement, or delivery."  (Docket Entry No. 32, Ex. 6).  Before he withdrew the funds, Riley sent the Bank a certified copy of the probate court final judgment giving him trustee authority.  This judgment was clearly an order from the probate court.  Stanley argues that the final judgment was not sufficient because it did not explicitly authorize a particular withdrawal from the safekeeping accounts.  She contrasts the judgment with several earlier orders in which the court explicitly authorized a particular amount of money to be transferred from the accounts.  But the probate court's judgment did give Riley, until a final mandate was issued on appeal, "all the powers and duties of a Trustee

10

under the Texas Trust Code and the Trust Indentures."  (Docket Entry No. 32, Ex. 8 at 8).  When Riley presented the Bank with the judgment, no mandate on appeal had been issued.

Under Texas law, a trustee has the authority to "exercise any powers . . . that are necessary or appropriate to carry out the purposes of the trust."  TEX. PROP. CODE § 113.002.  This authority is subject to limits imposed by the trust instrument, a statute, or "a subsequent court order."  TEX. PROP. CODE § 113.001.  Under the Code, courts are permitted to restrict a trustee's authority.  The probate court restricted access to the trust funds by approving the safekeeping agreements.  The record shows that, as a matter of law, the probate court's final judgment was sufficient to allow the Bank to release the funds to Riley on his written request.

The probate court judgment gave Riley all the powers given to a trustee under the trust instrument and the Texas Trust Code.  Section 113.001 lists these two items—the trust instrument and statutory law—and court orders as the three sources of limits to a trustee's power.  As trustee, Riley had the authority provided by the Code and the trust instruments to control the trust assets. As the Bank points out, the probate court's judgment gave Riley much broader authority that he needed to withdraw funds under the safekeeping agreements.  The probate court judgment met the safekeeping agreements' requirement for a court order authorizing the Bank to release funds to the trustee.

Stanley argues that even if the face of the probate court judgment showed that Riley had authorization to control trust assets, the Bank should have taken steps to ensure that Riley was authorized to obtain trust funds.  Stanley argues that the Bank could have asked the probate court for clarification, asked for an order that specifically tracked the safekeeping agreement language, or filed an interpleader action and deposited the funds Riley sought.  The Bank does not dispute that

it could have taken these steps.  The issue is whether its failure to do so breached the safekeeping agreement or otherwise made it improper for the Bank to release the funds to Riley.  The certified copy of the probate court's judgment stated that Riley had full trustee authority.  Alpert had not sought or obtained an order superceding the judgment when Riley asked the Bank to release the funds.  The probate court also made clear, after the fact, on the record in the bond hearing and in its findings of fact and conclusions of law, that regardless of whether the probate court judgment was superseded, Riley was authorized to act as trustee for the trusts.  The Bank was faced with the probate court judgment that gave Riley full authority to obtain trust funds and no legal basis for refusing to provide those funds in response to Riley's written request.  The letter from Roman Alpert's attorney was not sufficient to require the Bank to withhold the funds from Riley pending appeal.  Summary judgment for the Bank is appropriate on this basis.  The Bank's additional arguments provide further support for this result.

The Bank's second argument is that even if the probate court judgment did not satisfy the "court order" requirement in the safekeeping agreements, that judgment terminated the safekeeping agreements.  The Bank presents two reasons to support this argument.  The first reason is that the safekeeping agreements were relevant only to the receivership, which ended when the court determined that Riley was the proper trustee.  The probate court's orders appointing Gerstner as receiver stated that she would "administer the properties of the Trust so that there will be no loss or material injury to the Trust *pending the determination of the proper trustee* of the Trust and the resolution of this suit or until the court determines such receivership is no longer necessary or otherwise orders the receivership terminated."  (Docket Entry No. 32, Ex. 3 at 1 (emphasis added)).  When the probate court determined that Riley was the proper trustee, he had the authority and

12

responsibility to administer trust properties.  The receivership was unnecessary and ended under the terms of instrument that created it.  Without a receiver in place, there was no need for the safekeeping agreements, which were created only to reduce the amount of the bond the receiver needed to post.  *See* TEX. PROP. CODE § 194(5), (6).  Unlike a receiver, a trustee need not post a bond.[1]

The second and related reason the Bank identifies to support its argument that the safekeeping agreements were no longer effective is that they were interlocutory orders "necessarily terminated" by the probate court judgment.  It is undisputed that the orders creating the receiverships were interlocutory.  *See Schwager v. Texas Commerce Bank, N.A.*, 827 S.W.2d 504, 507 (Tex. App.–Houston [1st Dist.] 1992, writ denied) ("An order appointing a receiver is interlocutory."). The orders approving the safekeeping agreements during the receivership were by definition temporary.  The receiver was appointed to serve until the court determined who was trustee.  The safekeeping agreements applied during the receivership to serve needs of the receivership  that ended when the trustee was determined.  Under Texas law, when a final judgment is entered, temporary orders "cease[] to be valid, subsisting orders." *Rafferty v. Finstad*, 903 S.W.2d 374, 378 (Tex. App.–Houston [1st Dist.] 1995, writ denied) (quotation omitted).  "In general, temporary orders of a trial court issued during the pendency of a proceeding are superseded by the trial court's final order." *In re A.T.M.*, No. 12-07-00243-CV, 2009 WL 1492832, at *5 (Tex. App.–Tyler May 29, 2009, pet. denied) (holding that a temporary order grating "interim attorney's fees" (that were

---

[1]  This argument also responds to Stanley's argument that there is no difference between Riley's status as trustee and Gerstner's status as receiver with respect to the restrictions in the safekeeping agreements.  (Docket Entry No. 37 at 4). The safekeeping agreements applied specifically to the receivership, serving to reduce the required bond.  Although Gerstner as receiver was given broad powers over the trust, she was not a trustee.  When the trustee was determined, there is no basis to find that the safekeeping agreements continued to apply.

never paid) was superceded by the final judgment because the "final judgment omitted any mention of the interim attorney's fees and contained a provision denying all relief not expressly granted.").

In response, Stanley has cited *In re Guardianship of Miller*, 299 S.W.3d 179, 184 (Tex. App.–Dallas 2009, no pet.), for the proposition that interlocutory orders are merged into the final judgment, not superceded by it. Although Stanley stated in her brief that this only applies to interlocutory orders "not inconsistent" with the final judgment, the case law does not appear to include this limitation. *See id.* (collecting cases). And applying this limitation here does not help Stanley. The probate court's orders creating the receivership and the related safekeeping agreements are inconsistent with the final judgment. The orders gave the receiver power to exercise trust authority *until the proper trustee was determined*, and the safekeeping agreements limited that authority in order to lower the bond amount the receiver had to pay. These final judgment is inconsistent with these orders because the judgment gave Riley trust authority to the full extent of state law. Moreover, as the Bank points out, there is a difference between whether an interlocutory order is reviewable on appeal and whether it remains an enforceable order after final judgment. *Miller* and the cases stating that interlocutory orders "merge" with the final judgment only address appellate review. By contrast, *Rafferty* and *A.T.M.* deal with the continuing enforceability of interlocutory orders after the trial court enters final judgment. The orders in *Rafferty* and *A.T.M.*, like those at issue here, were temporary orders subject to revision or repeal by the final judgment, even if not explicitly mentioned in that judgment. The orders were, in effect, overruled or made irrelevant by the final judgment. By the same reasoning, the orders approving the safekeeping

14

agreements in the present case did not remain in force after the final judgment was issued, presenting another basis for granting summary judgment in favor of the Bank.[2]

The Bank's third argument supporting that result is based on a provision in the Texas Trust Code designed to insulate banks acting in good faith in dealing with a trustee from liability.  The current provision, amended in 2007, states:

> (a) A person who deals with a trustee in good faith and for fair value actually received by the trust is not liable to the trustee or the beneficiaries of the trust if the trustee has exceeded the trustee's authority in dealing with the person.
>
> (b) A person other than a beneficiary is not required to inquire into the extent of the trustee's powers or the propriety of the exercise of those powers if the person:
>
>   (1) deals with the trustee in good faith; and
>
>   (2) obtains:
>
>     (A) a certification of trust described by Section 114.086; or
>
>     (B) a copy of the trust instrument.

---

[2]  Stanley has not pleaded a restitution claim against the Bank, but the parties nonetheless discuss the issue in their briefing.  The Bank states that it started that discussion to illustrate that Texas law provides Stanley with alternate remedies for her losses and that the restitution remedy does not extend to the Bank.  This is consistent with the applicable law.  In *Miga v. Jensen,* 299 S.W.2d 98, 101-02 (Tex. 2009), the Texas Supreme Court allowed a party who was ordered to pay a judgment by the trial court to bring a restitution action against the judgment creditor after that judgment was reduced on appeal.  The court cited a variety of sources supporting an order of restitution after reversal.  One source was section 74 of the *Restatement of the Law of Restitution.*  Section 74 provides for restitution to "[a] person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder" once the judgment is reversed or vacated, "unless restitution would be inequitable."  Comment *h* states that an agent of the judgment creditor who receives the judgment debtor's assets and "pays it to the judgment creditor before reversal is not liable if the judgment was valid before reversal and if he had no knowledge of any fraud used in securing it." *Restatement* § 47, cmt. h.  In this case, the Bank was acting at the direction of Riley, the judgment creditor, at the time when the judgment was valid and there is no evidence that the Bank had knowledge of any fraud.  The law of restitution does not support Stanley's arguments for relief.

(c) A person who in good faith delivers money or other assets to a trustee is not required to ensure the proper application of the money or other assets.

(d) A person other than a beneficiary who in good faith assists a former trustee, or who in good faith and for value deals with a former trustee, without knowledge that the trusteeship has terminated, is protected from liability as if the former trustee were still a trustee.

(e) Comparable protective provisions of other laws relating to commercial transactions or transfer of securities by fiduciaries prevail over the protection provided by this section.

TEX. PROP. CODE § 114.081.

The first issue is whether the 2007 version of the statute, which is more generous to third parties like the Bank, applies to events that occurred in April 2006.  Texas law presumes that laws do not apply retroactively.  *Ex parte Abell*, 613 S.W.2d 255, 258 (Tex. 1981); *Houston Ind. Sch. Dist. v. Houston Chronicle Pub Co.*, 798 S.W.2d 580, 585 (Tex. App.–Houston [1st Dist.] 1990, writ denied).  "Texas courts apply statutes retroactively only if 'it appears by fair implication from language used that it was the intention of the Legislature to make it applicable to both past and future transactions.'"  *Houston Chronicle*, 798 S.W.2d at 585 (quoting *State v. Humble Oil & Refining Co.*, 169 S.W.2d 707, 708-09 (Tex. 1943)).  The amendments to § 114.081 were passed as part of a package of legislation, which described itself as "an act relating to the administration and operation of certain trusts and other property interests held for the benefit of another." Acts 2007, 80th Leg., ch. 451,  2007 Tex. Sess. Law Serv. Ch. 451 (H.B. 564).  The legislation included a provision stating that "the changes in law made by this Act apply to a trust existing or created on or after the effective date of this Act," September 1, 2007.  *Id.*, §§ 23, 24.  This provision does not state that the amendments apply only to trusts *created* after the effective date or to acts occurring after the effective date.  The provision states that the newly enacted law governs all trusts existing

16

on and created after September 1, 2007, which would include the DAT and RAT. The legislative history is consistent with this reading. The House of Representatives Judiciary Committee Report stated that the purpose of amending § 114.081 was "to conform its protection of third parties with the protection afforded by Section 1012 of the Uniform Trust Code." Texas Bill Analysis, H.B. 564, 2007. The Uniform Trust Code section stating that it applies to "all trusts created before, on or after" the effective date also states that the Code "is intended to have the widest possible effect within constitutional limitations." UNIF. TRUST CODE § 1106 & cmt. This includes application to transactions occurring before the effective date, except to the extent that it might violate constitutional rights by altering previously vested property rights. *Id.*

No Texas case has applied the amended statute. One Fifth Circuit case has suggested that application to transactions occurring before the effective date was appropriate. In *Fisher v. Miocene Oil & Gas Ltd.*, 335 F.App'x 483, 492 (5th Cir. 2009) (unpublished), the court declined to apply §114.081 because it had not been raised in the district court. But the court went on to observe that, if the claim were properly presented, it would be rejected. The relevant point is that in addressing transactions that occurred in 2005, the court quoted and discussed the 2007 amendments to the statute. *Id.* This supports applying the 2007 amendments to the Bank's release of funds to Riley in 2006.

Section 114.081 requires that the Bank have acted in good faith. Stanley argues that the Bank did not do so because it released the trust funds to Riley when "it was clear the entire Alpert family opposed that and contested Riley's authority over the trusts," and when the Bank had assumed the responsibilities set out in the safekeeping agreements. (Docket Entry No. 37 at 4). The record, however, precludes any finding of bad faith on the part of the Bank. In another context, the Texas Supreme Court has stated that "'bad faith' means more than merely negligent or unreasonable

conduct; it requires proof of an improper motive or willful ignorance of the facts." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285 (Tex. 1998).  Bad faith requires that the party in question have "acted in dishonest disregard of the rights" of others.  *Citizens Bridge Co. v. Guerra*, 258 S.W.2d 64, 69-70 (Tex. 1953).  The record shows that the Bank acted in reliance on a certified copy of the final judgment of the probate court stating that Riley was the trustee of the RAT and the DAT, with the full powers created by law.  The letter from Roman Alpert's lawyer showed that the Alpert family disagreed with the probate court judgment and would contest it on appeal.  But the judgment was effective absent the legal steps necessary to supercede or stay it pending appeal.  No such steps were taken at that time.  The letter from Alpert's lawyer provided no reasonable basis for the Bank to disregard a final judgment issued by the probate court.  As a matter of law, the Bank acted in good faith.

The Bank argues that it is protected from liability under four separate subsections of the statute.  Subsection (a) protects the Bank from liability if "the trustee" exceeded his authority in dealing with the Bank if it provided the trusts with "fair value actually received."  TEX. PROP. CODE § 114.081(a).  The Bank provided a valuable service to the trusts by holding and investing the trust assets during the receivership.  Any effort to impose liability on the Bank based on allegations that Riley exceeded the authority that the probate court's judgment gave him as trustee falls squarely within the protections of subsection (a).  Subsection (b) states that the Bank need not "inquire into the extent of the trustee's power or the propriety of the exercise of those powers" if the Bank obtains a copy of the trust instrument.  TEX. PROP. CODE § 114.081(b).  Riley presented the Bank with a certified copy of a court order stating that he was trustee.  The court order was a formal statement of authority on which the Bank was entitled to rely.  Subsection (b) may also protect the Bank from Stanley's claims that it should have questioned Riley's authority.  Subsection (c) relieves the Bank

18

from an obligation to ensure the proper use of assets delivered to a trustee.  TEX. PROP. CODE §
114.081(c).  Because Riley was the court-ordered trustee when the Bank released the trust funds to
him, the Bank had no obligation to ensure that Riley's use of those assets was lawful.  Finally,
subsection (d) protects the Bank if it assisted a former trustee or dealt with a former trustee for value
without knowledge that the trusteeship had terminated.  TEX. PROP. CODE § 114.081(d).  Under this
subsection, Stanley's argument that Riley was not validly appointed trustee by the probate court
does not permit her to recover against the Bank.  There is no evidence that the Bank had actual
knowledge that Riley was not the trustee.  Indeed, there was no basis for the Bank to have taken this
position until after the Court of Appeals issued its opinion reaching this result in 2008.

Even if the 2007 version of section 114.081 did not apply to the transactions at issue, the
prior version of the statute would still protect the Bank from liability.  The prior version stated:

> (a) A person who actually and in good faith pays to a trustee money
> that the trustee is authorized to receive is not responsible for the
> proper application of the money according to the trust.

> (b) A right or title derived from the trustee in consideration of the
> monetary payment under Subsection (a) of this section may not be
> impeached or questioned because of the trustee's misapplication of
> the money.

TEX. PROP. CODE § 114.081 (2006 version).  The Bank released the funds to Riley in good faith.
Under the probate court judgment, he was authorized to receive that money.  A statute providing
remedies for breach of trust that became effective on January 1, 2006 stated as follows:

> [A] person other than a beneficiary who, without knowledge that a
> trustee is exceeding or improperly exercising the trustee's powers, in
> good faith assists a trustee or in good faith and for value deals with
> a trustee is protected from liability as if the trustee had or properly
> exercised the power exercised by the trustee.

TEX. PROP. CODE § 114.008(b) (2006 version).  The Bank assisted Riley by releasing the trust money to him.  If Riley was exceeding his authority by removing that money, there is no evidence that the Bank had any knowledge of Riley's improper action.  The opposition from the Alperts does not establish the Bank's knowledge of Riley's wrongdoing but only of a dispute that would be pursued on appeal.  The statutes in effect in 2006 protect the Bank from liability to Stanley on the present record.

Based on Riley's authority under the probate court judgment and the statutory protections for banks dealing with trustees, as a matter of law the Bank did not violate the law and Stanley cannot recover against the Bank on any of her counterclaims.  Her counterclaims for breach of fiduciary duty, negligence, and gross negligence fail for two other reasons as well.

First, these claims are all barred by the economic loss rule, which bars tort claims "[w]hen the injury is only the economic loss to the subject of a contract itself."  *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *see also Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991).  The only relief Stanley seeks is "an amount equal to the trust funds released by U.S. Trust to Riley." (Docket Entry No. 13, ¶ 26; *see also id.*, ¶¶ 22, 24).  She seeks this same amount on all her claims.  The tort injury alleged is identical to the contractual loss.  This is precisely the sort of tort claim that the economic loss rule bars.  Stanley has not responded to this argument, other than to state that the tort claims "are inherently factual and not appropriate for summary judgment," and that determining whether the economic loss rule should apply is "beyond the scope of these initial motions" on liability because it pertains to damages.  (Docket Entry No. 37 at 8-9).  That argument is unpersuasive.  As pleaded, Stanley's case necessarily implicates the economic loss rule.  There is no need to assess damages to reach this conclusion.  As Stanley points, there are some cases in which tort damages separate from the contractual loss can

20

arise from the performance of a contract.  The counterclaim allegations do not fall in that category.

Finally, as the Bank points out, there is a body of case law holding that banks do not owe tort duties to their customers.  *See, e.g., Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.–Houston [1st Dist.] 1996, no writ) (stating that "the relationship between a bank and its customers does not usually create a special or fiduciary relationship" unless there are specific facts showing a special relationship, "such as excessive lender control over, or influence in, the borrower's business activities."); *Canyon Lake Bank v. New Braunfels Utilities*, 638 S.W.2d 944 (Tex. App.–Austin 1982, no writ) ("If the fund were deposited by one as trustee, the trustee would have the unfettered right to withdraw the sum, and absent knowledge of the trustee's misconduct, the bank would be obliged to assume the trustee had appropriated the money for trust purposes.  Indeed, the [Texas Supreme] Court pointed out that any other rule would create chaos as it would put the bank on inquiry of every withdrawal made from a fund deposited by a trustee or like fiduciary.").  Stanley has not responded to these cases or argument.  They provide further support for dismissing the tort counterclaims.

## IV.    Conclusion

The Bank of America's motion for summary judgment is granted.  Stanley's motion is denied.  By **August 5, 2010**, the Bank must submit a proposed order of final judgment consistent with this opinion.

SIGNED on July 26, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

21